IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

STOYAN MARKOV, GERRY G.           *
SEBASTIAN, and ZORICA ZUKIC,      *
individually and on behalf        *
of other similarly situated       *
persons, and BILLY KIRKLAND,      *
                                  *
     Plaintiffs,                  *
                                  *
          v.                      *           CV 215-018
                                  *
GOLDEN ISLES CRUISE LINES, INC.,  *
and APEX ENTERTAINMENT            *
MANAGEMENT LLC,                   *
                                  *
     Defendants.                  *

_____

**O R D E R**

_____

Presently before the Court is Defendants' converted motion

for summary judgment (Doc. 10). For the reasons below,

Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

The present dispute arises out of Plaintiffs' employment as

casino dealers aboard the Emerald Princess II ("EPII"), a casino

ship operated out of the Port of Brunswick, Georgia. (Dyer Aff.,

Doc. 21-1, ¶ 3.) While working on the EPII, Plaintiffs were

employed by Defendant Golden Isles Cruise Lines, Inc. ("GICL"),

the company that owns the EPII, until December 23, 2012. (Id.;

Markov Decl., Doc. 23, ¶ 2.) Thereafter, Plaintiffs were

employed by Apex Entertainment Management LLC ("Apex"), the company that furnishes dealers for the EPII. (Id.) Yet, regardless of the particular employer, Plaintiffs, as casino dealers, performed the same primary duties: operate casino games, deal cards, shuffle cards, deal dice, count chips, and provide customer service. (Dyer Aff. ¶ 13.)

Monday through Thursday, the EPII would have one cruise each night spanning from 6:30 p.m. to 12:15 p.m. (Markov Decl. ¶ 3.) Meanwhile, Friday through Sunday, the EPII would have two cruises per day. (Id.) The day cruise would last from 10:30 a.m. to 4:15 p.m., and the night cruise would last from 6:30 p.m. to 1:15 a.m. on Fridays and Saturdays and the usual 6:30 p.m. to 12:15 p.m. on Sunday. (Id.) Thus, Plaintiffs' shifts generally lasted 5.75 hours, except for Friday and Saturday nights when they would extend to 6.75 hours. (Id.) While Plaintiffs could not work more than one shift Monday through Thursday, it was not uncommon for Plaintiffs to work multiple shifts on Friday, Saturday, or Sunday. (Defs.' Comp. Ex. 2, Doc. 21-9 through 21-12.)

For their efforts, Plaintiffs received between $20 and $35 per shift plus tips earned in accordance with Defendants' tip-pooling arrangement. (Dyer Aff. ¶ 18.) However, Plaintiffs contend that this arrangement left them with inadequate compensation in violation of the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201 *et seq.* First, because management employees received part of the tip pool, Plaintiffs assert that they were not paid minimum wage compensation. Second, Plaintiffs argue that the tip pool did not provide them with compensation for overtime hours worked.

With these contentions, Plaintiffs filed the instant complaint on January 29, 2015, seeking redress under the FLSA. In response, Defendants filed a pre-answer motion to dismiss. (Doc. 10.) On December 30, 2015, because of Defendants' reliance on matters outside the pleadings, the Court converted their motion to dismiss into the instant motion for summary judgment. (Doc. 19.) Thereafter, in compliance with Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), the Clerk provided Plaintiffs with notice of the motion, the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 20.) Subsequently, Defendants filed a supplemental brief (Doc. 22), Plaintiffs filed two responses (Docs. 23, 26), Defendants filed a reply (Doc. 29), and Plaintiffs filed a sur-reply (Doc. 34). Consequently, Defendants' motion is now ripe for the Court's consideration.

## II. DISCUSSION

Defendants' motion for summary judgment will be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In evaluating the contentions of the parties, the Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

Initially, the moving party bears the burden and must show the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats &

4

Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex, 477 U.S. 317). Before evaluating the non-movant's response in opposition, the Court must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed

5

verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Instead, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

## A. Preliminary Matters

Defendants contend that the Court's consideration of the merits should be precluded based on the following six arguments. First, the statute of limitations applicable to Plaintiffs' claims against Defendant GICL expired before this suit was initiated. Second, pursuant to his employment contract, Plaintiff Kirkland's claims against Defendant Apex are subject to mandatory arbitration. Third, the FLSA's seamen's exemption excludes Plaintiffs from the minimum wage and overtime protections of the FLSA. Fourth, Plaintiffs have not produced sufficient information evidencing that Defendants were enterprises engaged in commerce. Fifth, Plaintiff Kirkland was not named in Plaintiffs' complaint. Sixth, Plaintiffs refused to accept reasonable compensation for their overtime claims.

### 1.  Statute of Limitations

Under the FLSA, the general statute of limitations for any minimum wage or overtime compensation claim is two years. 29 U.S.C. § 255(a). However, if the employer's violation was "willful," then the statute of limitations extends to three years. Id.

To establish that a violation was willful, "the employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited or showed reckless disregard about whether it was." Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1280 (11th Cir. 2008)(internal quotation marks and citation omitted). "Reckless disregard," according to federal regulations, is the "'failure to make adequate inquiry into whether conduct is in compliance with the [FLSA].'" Id. (quoting 5 C.F.R. § 551.104).

In the case at hand, viewing the evidence in the light most favorable to Plaintiffs, Defendant GICL's employment of Plaintiffs Markov, Sebastian, and Kirkland ended on December 23, 2012.[1] (Wanzo Aff., Doc. 21-7, ¶¶ 6-13.) Thus, when Plaintiffs filed suit on January 29, 2015, the FLSA's general statute of limitations as to each of their claims against Defendant GICL had already run. Accordingly, to survive Defendants' motion for

---

[1] Plaintiff Zukic was never employed by Defendant GICL. (Zukic Decl., Doc. 26-3; Wanzo Aff., Doc. 21-7.) Therefore, she has no viable FLSA claim against Defendant GICL.

summary judgment, Plaintiffs must present enough evidence to demonstrate a genuine dispute regarding whether Defendant GICL's FLSA violations were willful.

Based upon the record at hand, Plaintiffs have not met their burden. Plaintiffs have not presented any evidence indicating that Defendant GICL actually knew of the alleged violations, nor have they presented evidence suggesting that Defendant GICL failed to make an adequate inquiry into whether its tip-pooling arrangement was consistent with the FLSA. As a result, Plaintiffs' claims against Defendant GICL may not proceed.

For the same reasons, all but two of Plaintiffs' claims arising against Defendant Apex between December 24, 2012, and January 28, 2013, are barred. The two exceptions are Stoyan Markov and Billy Kirkland's overtime claims for the week of December 31, 2012, through January 6, 2013. The time records submitted by Defendants – indicating that Plaintiffs Markov and Kirkland worked more than forty hours during this week – are enough to produce a genuine dispute as to whether Defendant Apex knowingly violated the FLSA.

## 2.  Arbitration Agreement

Considered to be a "'congressional declaration of a liberal federal policy favoring arbitration agreements,'" the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, "was enacted in

1925 to reverse the longstanding judicial hostility toward arbitration." <u>Caley v. Gulfstream Aerospace Corp.</u>, 428 F.3d 1359, 1367 (11th Cir. 2005); <u>Scurtu v. Int'l Student Exch.</u>, 523 F. Supp. 2d 1313, 1318 (S.D. Ala. 2007)(quoting <u>Davis v. S. Energy Homes, Inc.</u>, 305 F.3d 1268, 1273 (11th Cir. 2002)). To do so, "[t]he FAA generally provides for the enforceability of 'a contract evidencing a transaction involving commerce,'" which generally includes all contracts of employment except those involving "transportation workers." <u>Circuit City Stores, Inc. v. Adams</u>, 532 U.S. 105, 119 (2001); <u>Caley</u>, 428 F.3d at 1367 (quoting 9 U.S.C. § 2). "Further, courts have consistently found that claims arising under federal statutes may be the subject of arbitration agreements and are enforceable under the FAA." <u>Caley</u>, 428 F.3d at 1367 (internal quotation marks and citation omitted).

Once a court determines that the applicable arbitration agreement is part of a covered "contract, transaction, or refusal," the written agreement will be "valid, irrevocable, and enforceable, save upon grounds as exist at law or in equity for the revocation of the contract." 9 U.S.C. § 2. While "one of the purposes of the FAA is to give arbitration agreements the same force and effect as other contracts," "state law generally governs whether an enforceable contract or agreement to arbitrate exists." <u>Caley</u>, 428 F.3d at 1367-68. "Thus, in

determining whether a binding agreement arose between the parties, courts apply the contract law of the particular state that governs the formation of contracts." Id.  Even so, "the 'federal policy favoring arbitration . . . is taken into consideration.'" Id. (quoting Cooper v. MRM Inv. Co., 367 F.3d 493, 498 (6th Cir. 2004)).

In this case, Defendants argue that Plaintiff Kirkland's claims against Defendant Apex should be dismissed because they are subject to mandatory arbitration.  Defendants base their argument on the following provisions from the arbitration agreement within Plaintiff Kirkland's at-will employment contract with Defendant Apex:

> Any dispute, liability, loss, or claim, in any way arising from, in connection with, or related whatsoever to this Agreement and/or [Kirkland's] employment with [Apex] . . . shall be resolved exclusively through binding arbitration . . . in accordance with the rules of the American Arbitration Association. [Kirkland] further agrees and acknowledges that he . . . voluntarily and knowingly waives any right he . . . has to a jury trial of any such claim arising from or in connection with this Agreement or [Kirkland's] employment with [Apex].

(Wanzo Aff., Ex. D, Doc. 21-8.)  In response, Plaintiff Kirkland argues that this arbitration agreement is invalid because it is an unconscionable contract of adhesion.  (Pls.' Resp., Doc. 23, at 21.)  In the alternative, Plaintiff Kirkland argues that, if the agreement is enforceable, it should only bar claims arising

on or after the date of the agreement, June 25, 2014. (Id. at 20.)

In his brief, Plaintiff Kirkland presents arguments challenging the enforceability of the arbitration agreement and the at-will employment contract generally. To the extent Plaintiff Kirkland's contentions involve the latter, they will not be addressed. Based on Supreme Court precedent, the Eleventh Circuit has held that "[i]f . . . [a party's] claims of adhesion, unconscionability, . . . and lack of mutuality pertain to the contract as a whole, and not to the arbitration provision alone, then these issues should be resolved in arbitration." Benoay v. Prudential-Bache Secs., Inc., 805 F.2d 1437, 1441 (11th Cir. 1986).

Turning to the merits of Plaintiffs' arguments, a contract of adhesion, in Georgia, is "a standardized contract offered on a 'take it or leave it' basis and under such conditions that a consumer cannot obtain the desired product or service except by acquiescing in the form contract." Realty Lenders, Inc. v. Levine, 649 S.E.2d 333, 336 (Ga. Ct. App. 2007)(internal quotation marks and citation omitted). However, as Defendants highlight, Georgia courts have found that "the fact that a contract is adhesive does not, standing alone, render the contract unenforceable." Id.; see also Mathis v. Orkin Exterminating Co., 562 S.E.2d 213, 215 (Ga. Ct. App.

11

2002)(stating that "contracts of adhesion are enforceable in Georgia, even though they are strictly construed against the drafter"). As a result, Plaintiffs' unenforceability arguments turn on the sole question of unconscionability.

In Georgia, "'the basic test for determining unconscionability is whether, in light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.'" Dale v. Comcast Corp., 498 F.3d 1216, 1219 (11th Cir. 2007)(quoting NEC Techs., Inc. v. Nelson, 478 S.E.2d 769, 771 (Ga. 1996)). The first of the two specific types of unconscionability is procedural unconscionability, which "'addresses the process of making [a] contract.'" Id. In determining whether this form of unconscionability exists, Georgia courts look to the following factors: "age, education, intelligence, business acumen and experience of the parties, their relative bargaining power, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of meaningful choice." NEC Techs., 478 S.E.2d at 771-72.

The second type of unconscionability that Georgia recognizes is substantive unconscionability, which focuses "on 'matters such as the commercial reasonableness of the contract

terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns.'" Dale, 498 F.3d at 1219.  However, under Georgia law, "[a] contract is substantively unconscionable only where it is one that 'no sane man not acting under a delusion would make and that no honest man would take advantage of.'" Dale v. Comcast Corp., 453 F. Supp. 2d 1367, 1375 (quoting Hall v. Fruehauf Corp., 346 S.E.2d 582, 583 (Ga. 1986)).  In reaching a conclusion on this form of unconscionability, "courts have focused on matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." NEC Techs., 478 S.E.2d at 392.

In this case, Plaintiff Kirkland has submitted no evidence of unconscionability outside of the arbitration agreement itself.  Therefore, to determine procedural unconscionability, the Court is left largely with two factors upon which to base its evaluation: "the conspicuousness and comprehensibility of the contract language . . . [and] the oppressiveness of [its] terms."  Yet, the Court finds neither of these factors to be problematic.  The agreement, titled "Arbitration and Waiver of Jury Trial," is appropriately named and is identified by its sufficiently large, bolded text in all capital letters. (Wanzo Aff., Ex. D, Doc. 21-8.)  Additionally, the agreement is short

in length, straightforward in its terms, and, on its face, fair to both sides. As for substantive unconscionability, the lack of evidence leaves the Court with no basis upon which to conclude that the agreement lacks commercial reasonableness or that it clearly favors one party over another.

While unconscionability is ordinarily a question reserved for a factfinder, the issue cannot move forward in this case. Teaming the lack of evidence presented along with the strong federal policy in favor of arbitration, the Court concludes that no genuine dispute exists as to the unconscionability of the agreement. Accordingly, the parties have a valid arbitration agreement, and the Court must determine whether Plaintiff Kirkland's claims fall within its scope. Scurtu, 523 F. Supp. 2d at 1318.

Here, Plaintiff Kirkland concedes that, if valid, the agreement applies to his claims arising on or after the contract of June 25, 2014. However, Defendant Apex argues that the agreement should be applicable to any claims arising out of Plaintiff Kirkland's employment with the company, regardless of when they arose. In support of its argument, Defendant Apex points to language within the agreement in which Plaintiff Kirkland agreed to arbitrate and waive his right to a jury trial for any such "claim arising from or in connection with . . . [his] employment." (Wanzo Aff., Ex. D, Doc. 21-8.)

Although the arbitration agreement does provide as Defendant Apex suggests, the at-will contract in which the arbitration agreement is found specifically states that Plaintiff Kirkland's "employment shall commence on 06/25/2014." (Id.) Thus, on the face of the agreement, a genuine dispute exists regarding whether Plaintiff Kirkland's claims arising before this date are subject to arbitration. Hence, without any supplemental evidence from Defendant Apex, the Court can only conclude that the arbitration provisions bar those of Plaintiff Kirkland's claims arising on or after June 25, 2014.

### 3.  Seamen's Exemption

Under 29 U.S.C. § 213(a)(12), the FLSA's minimum wage and overtime provisions are inapplicable to "any employee employed as a seaman on a vessel other than an American vessel." Similarly, the FLSA's overtime provisions are inapplicable to "any employee employed as a seaman." Id. § 213(b)(6). An employee is "employed as a seaman" if

> he performs, as master or subject to the
> authority, direction, and control of the
> master aboard a vessel, service which is
> rendered primarily as an aid in the
> operation of such vessel as a means of
> transportation, provided he performs no
> substantial amount of work of a different
> character.

29 C.F.R. § 783.31.[2]  So long as his seaman-like work is "not substantial in amount," the fact that an employee "performs some work of a nature other than that which characterizes the service of a seaman" is immaterial.  Id. § 783.37.  An employee's seaman-like work will only be considered "substantial in amount" if it "occupies more than 20 percent of the time worked by the employee during the workweek." Id.  However, this 20 percent rule "must not be applied in a strict, mechanical fashion, because the amount of nonseaman's work an employee performs can vary from week to week." Godard v. Ala. Pilot, Inc., 485 F. Supp. 2d 1284, 1296 (S.D. Ala. 2007).

In the case at hand, given the EPII's status as an "American vessel," the seamen exemption cannot bar Plaintiffs' minimum wage claims.  On the other hand, if Plaintiffs are seamen within the meaning of FLSA § 213(b)(6), then their overtime claims will be barred.  Yet, at this juncture, a finding on this issue will not be made.  Plaintiffs have come forward with testimonial evidence indicating that they never aided in the movement or operation of the EPII. (Markov Decl. ¶ 7; Sebastian Decl., Doc. 23, ¶ 6; Kirkland Aff., Doc. 23, ¶¶ 4-5; Zukic Decl., Doc. 26-3, ¶ 7.)  In fact, Plaintiffs Markov, Sebastian, and Zukic have each declared the following:

---

[2]  Courts must defer to the regulations of executive branch agencies when the agencies' regulations are "based on a permissible construction of the statute." Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).

"I was told that if I ever touched any mechanical or electrical part of the ship, I would be fired." (Markov Decl. ¶ 7; Sebastian Decl. ¶ 6; Zukic Decl. ¶ 7.)   As a result, a genuine dispute exists as to whether Plaintiffs were seamen.

### 4. Enterprise Engaged in Commerce

For the FLSA's minimum wage and overtime provisions to be applicable to an employee, that individual must be one "who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. §§ 206(a), 207(a).[3] In this case, Plaintiffs contend that they are employed in an "enterprise engaged in commerce," which includes an enterprise that

> (i) has employees engaged in commerce or in the production of goods for commerce or that has employees handling, selling, or otherwise working on goods or materials that

---

[3] Viewing the evidence in the light most favorable to Plaintiffs, a genuine dispute exists as to whether the EPII constitutes an "enterprise" entered into by Defendants for the purpose of generating income from gambling operations and food and beverage sales. See 29 U.S.C. § 203(r)(1).   While Defendants have not raised the issue, the FLSA excludes from an "enterprise" those "activities performed for [an] enterprise by an independent contractor." Id.   Because Defendant Apex is a separate legal entity that provides dealers for the EPII, the Court suspects that this issue may arise moving forward.   However, at this juncture, a genuine dispute exists as to whether Plaintiffs, in their capacity as dealers, were "independent contractors."   In reaching this conclusion, the Court has relied upon evidence suggesting that Defendant GICL may have retained meaningful control over the employees of Defendant Apex. See Santelices v. Cable Wiring, 147 F. Supp. 2d 1313, 1319 (S.D. Fla. 2001)(emphasizing the degree of control an entity exerts over a putative independent contractor as one of several factors used to determine whether an individual is an employee or an independent contractor).   For example, Defendant GICL's chief executive officer "has overseen all aspects of the training and management of casino managers who have been employed by GICL and APEX." (Dyer Aff. ¶¶ 3, 7.)

have been moved in or produced for commerce by any person; and

(ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated).

Id. § 203(s)(1)(A). Should Plaintiffs seek to make this showing with evidence of "employees handling, selling, or otherwise working on goods or materials that ha[d] been moved in or produced for commerce," they must present evidence indicating (1) that "at least two employees engage[d] in 'handling, selling, or otherwise working on goods or materials that ha[d] been moved in or produced for commerce by any person'" and (2) that these employees "handle[d] such goods or materials on a 'regular and recurrent basis.'" Exime v. E.W. Ventures, Inc., 591 F. Supp. 2d 1364, 1369 (S.D. Fla. 2008)(quoting 29 U.S.C. § 203(s)(1)(A)(i); 29 C.F.R. § 779.238). Furthermore, as used here, commerce means "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C. § 203(b).

With respect to Defendants' motion, Plaintiffs have submitted sufficient evidence indicating that they were employed by an enterprise engaged in commerce. First, Plaintiffs have submitted (1) Plaintiff Markov's declaration indicating that

"food for the [EPII] was delivered by Sysco, a multi-national food distributor" and (2) an EPII brochure indicating that meals are served aboard the ship.[4] (Markov Decl. ¶ 11; EPII Brochure, Doc. 32-2.)   Interpreting this information in the light most favorable to Plaintiffs and drawing all justifiable inferences in their favor, the Court finds that the evidence demonstrates a genuine dispute as to whether the EPII had employees regularly and recurrently handling food items that had moved among or between states.   See Leon v. Tapas & Tintos, Inc., 51 F. Supp. 3d 1290, 1295 (S.D. Fla. 2014)(finding it reasonable to infer that "goods or materials used in [a restaurant] moved in interstate commerce before they were delivered to the restaurant"); Diaz v. HBT, Inc., No. 11cv1856, 2012 WL 294749, at *4 (D. Md. Jan. 31, 2012)("It is difficult to imagine a defendant-employer in the twenty-first century that does not have employees who handle, sell, or otherwise work on goods or materials that have moved in or have been produced for commerce by any person."); Lopez v. Top Chef Inv., Inc., No. 07-21598-CV, 2007 WL 4247646, at *2 (S.D. Fla. Nov. 30, 2007)(finding the first prong of enterprise coverage to be met based on a

---

[4]   In its current form, the text on the brochure indicating that meals are served on the EPII is inadmissible hearsay, which generally should not be considered on a motion for summary judgment.  See Fed. R. Evid. 801-802; Jones v. UPS Ground Freight, 683 F.3d 1283, 1293 (11th Cir. 2012).  However, because this statement "could be reduced to admissible evidence at trial," the Court may consider it as part of the instant motion.  Jones, 683 F.3d at 1293-94 (internal quotation marks and citation omitted).

reasonable inference "that some of the goods used in the [r]estaurant moved in interstate commerce before they were delivered to the [r]estaurant"). Moreover, because Plaintiffs' evidence also indicates that the EPII is an enterprise with weekly revenue between $100,000 and $150,000, there is a genuine dispute that the EPII had an annual gross sales volume in excess of $500,000. (Markov Decl. ¶ 12; Sebastian Decl. ¶ 9; Markov Sec. Supp. Aff., Doc. 32-1, ¶ 2.)

### 5. Plaintiff Kirkland

Within their briefs, Defendants also express skepticism regarding the propriety of Plaintiff Kirkland's presence in this suit. According to FLSA § 216(b), an FLSA action "may be maintained against any employer . . . by any one or more employees for and on behalf of himself or themselves and other employees *similarly situated*." (Emphasis added). However, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." Id. Here, Plaintiff Kirkland was not named in the original complaint, but he did file a written consent to legal action on February 2, 2015. (Doc. 4.) Thus, the only remaining question is whether he is "similarly situated" to the other Plaintiffs.

Regarding the meaning of "similarly situated," the FLSA nor the Eleventh Circuit have specifically defined the phrase.

Morgan, 551 F.3d at 1259 ("The FLSA itself does not define how similar the employees must be before the case may proceed as a collective action. And we have not adopted a precise definition of the term."). Nevertheless, the Eleventh Circuit has emphasized the similarity of "job requirements" and "pay provisions" as two significant factors in making this determination. Id. (internal quotation marks and citation omitted).

Given the evidence before it, the Court finds that Plaintiff Kirkland, in his capacity as a casino dealer aboard the EPII, is similarly situated to the original Plaintiffs. All four individuals had the same duties as dealers, and all four were paid a flat fee per cruise plus their share of the tip-pooling arrangement. On the other hand, Plaintiff Kirkland, in his capacity as a maintenance worker, is not similarly situated to the original Plaintiffs.[5] Although Plaintiffs need only present a "reasonable basis" regarding the similarity between original and opt-in plaintiffs, the difference in job duties between a dealer and a maintenance worker is enough to preclude the requisite finding of similarity. See id. at 1260 (internal quotation marks and citation omitted). Accordingly, Plaintiff Kirkland's claims seeking FLSA relief in his capacity as a

---

[5]    In addition to his work as a dealer, Plaintiff Kirkland performed maintenance work on the EPII while it was docked. (Kirkland Aff. ¶ 3; Kirkland Supp. Aff., Doc. 26-4, ¶ 4.) However, Plaintiffs make no allegations regarding such work in their complaint or amendments thereto.

maintenance worker are dismissed without prejudice. <u>See</u> <u>Cameron-Grant v. Maxim Healthcare Servs., Inc.</u>, 347 F.3d 1240, 1243 n.2 (11th Cir. 2003)("If the claimants are not similarly situated . . . the opt-in plaintiffs are dismissed without prejudice.").

### 6. Refusal of Reasonable Compensation

Defendants contend that the Court should grant summary judgment as to Plaintiffs' overtime claims because Plaintiffs refused to accept reasonable compensation for the full value of such claims. (Defs'. Br., Doc. 22, at 22.) However, Defendants do not provide any authority for their assertion. Consequently, the Court cannot conclude that Defendants, based on this theory, are entitled to judgment as a matter of law.

### B. Minimum Wage Claims

Turning to the merits of Plaintiffs' claims, the FLSA's minimum wage provision provides as follows: "Every employer shall pay to each of his employees . . . not less than[] $7.25 an hour." 29 U.S.C. § 206(a)(1)(C). Yet, to be employed, a person must be "suffered or permitted to work." <u>Id.</u> § 203(g). In considering whether a person was "suffered or permitted to work," it "is not relevant that the employer did not ask the employee to do the work." <u>Allen v. Bd. of Pub. Educ. for Bibb</u> <u>Cnty.</u>, 495 F.3d 1306, 1314 (11th Cir. 2007). "The reason that

the employee performed the work is also not relevant." Id. (internal quotation marks and citation omitted). If the employer knows or has reason to believe that the employee continues to work, the . . . hours must be counted." Id. (internal quotation marks and citation omitted). Thus, to prevail on a minimum wage claim, a plaintiff must show that: (1) he or she worked without receiving minimum wage compensation and (2) the employer knew or should have known of that work. See id. at 1314-15; 29 C.F.R. § 785.11.

## 1. Minimum Wage Compensation

While the general minimum wage is set at $7.25 per hour, "[t]he FLSA contains an exception that permits employers to pay less than the general minimum wage - $2.13 per hour – to a 'tipped employee' as long as the employee's tips make up the difference between the $2.13 minimum wage and the general minimum wage." Montano v. Montrose Rest. Assocs., Inc., 800 F.3d 186, 188 (5th Cir. 2015) (citing 29 U.S.C. § 203(m)). "This employer discount is commonly referred to as a 'tip credit.'" Id. Yet, an employer may not claim a tip credit unless "the employer informs the employee of the FLSA's tip provisions." Rubio v. Fuji & Teppani, Inc., No. 6:11-cv-1753, 2013 WL 230216, at *2 (M.D. Fla. Jan. 22, 2013) (citing 29 U.S.C. § 203(m)). Additionally, "the tip pool may only include customarily tipped employees." Id. "If an employer fails to satisfy one of these

preconditions, the employer may not claim the tip credit, regardless of whether the employee suffered actual economic harm as a result." Kubiak v. S.W. Cowboy, Inc., No. 3:12-cv-1306, 2014 WL 2625181, at *2 (M.D. Fla. June 12, 2014). However, "a tipped employee may voluntarily choose to share tips with an otherwise ineligible employee so long as that tip-sharing is done without coercion by the employer." Id.

Here, Plaintiffs contend that the tip-pooling arrangement violated the FLSA because management employees took tips from the share while not being "customarily tipped employees." (Pls.' Resp., Doc. 23, at 18.) In evaluating the pertinent facts, the Court notes that there is no dispute that (1) Plaintiffs, as casino dealers, are tipped employees; (2) Plaintiffs did not retain all of their tips; and (3) Plaintiffs, as part of the tip-pooling arrangement, were required to share tips with other members of the "Casino Staff, including Casino Management and Casino Cage Staff." (Defs.' Comp. Ex. 3, Doc. 21-13.) Conversely, there is a genuine dispute regarding whether Defendants' management employees were employees who "customarily and regularly receive[d] tips." 29 U.S.C. § 203(m). According to Defendants' evidence, "[i]n the casino-ship industry, generally, and on the EPII, specifically, casino managers customarily and regularly receive tips from customers." (Dyer Aff., Defs.' Ex. A, Doc. 21-1, ¶ 16.) Yet, Plaintiffs' evidence

indicates that it is not customary in the casino industry, generally, or on the EPII, specifically, for managers to receive tips. (Markov Supp. Aff., Doc. 26-1, ¶¶ 1-2.) In fact, Plaintiffs each declare the following: "I never saw managers or supervisors receive tips from customers on the Emerald Princess II." (Pls.' Ex. A-D, Doc. 26-1.)

Even with a genuine dispute as to management's receipt of tips, Defendants contend that they are still entitled to summary judgment. Specifically, they argue that the tip-pooling arrangement is nevertheless permissible because Plaintiffs entered this arrangement voluntarily. However, because Plaintiffs directly refute the voluntariness of the arrangement, summary judgment is also improper on this issue. (Markov Supp. Aff. ¶ 3; Sebastian Supp. Aff. ¶ 3; Zukic Decl. ¶ 6; Kirkland Supp. Aff. ¶ 3.)

## 2. Employer's Knowledge

The FLSA's knowledge requirement is fulfilled if the employer knew or had reason to know that the employee was working at the time for which he or she was improperly compensated. Allen, 495 F.3d at 1314. In this minimum wage case that involves the inadequacy, rather than the absence, of payment, Defendants do not contend that they were unaware of Plaintiffs' work. In fact, in addition to Plaintiffs' evidence, Defendants have submitted over five hundred pages of payroll and

time sheet documentation demonstrating their knowledge of Plaintiffs' work. (Defs.' Comp. Ex. 2, Docs. 21-9 through 21-12.) Consequently, a genuine dispute of material fact also exists as to this element of Plaintiffs' minimum wage claims.

### C. Overtime Claims

Under § 207 of the FLSA, "an employer may not employ his employee for a workweek longer than forty hours unless his employee receives overtime compensation at a rate not less than one and a half times his regular rate." Allen, 495 F.3d at 1314 (citing 29 U.S.C. § 207(a)(1)). For a plaintiff to prevail on a claim based on this section, the plaintiff must show that (1) he or she worked overtime without compensation and (2) the employer knew or should have known of the overtime work. Id. at 1314–15 (citing Reich v. Dep't of Conservation & Nat. Res., 28 F.3d 1076, 1081–82 (11th Cir. 1994)).

### 1. Defendants' Records Indicate More Than Forty Hours

Along with its motion for summary judgment, Defendant Apex submitted a record of shifts worked, an earnings statement, and a record of tips corresponding to each Plaintiff for each pay period he or she worked. (Comp. Ex. D, Docs. 21-10 through 21-12.) Although Defendant Apex did not record the number of hours worked by each Plaintiff, the Court is satisfied that these documents indicate that Plaintiffs worked more than forty hours

without proper compensation during a certain number of weeks – specifically, those listed in Court's Exhibit 1.[6] Viewing the facts in the light most favorable to Plaintiffs, the Court made this conclusion after basing Friday and Saturday night shifts on a length of 6.75 hours and all other shifts on a length of 5.75 hours.[7] (Markov Decl. ¶ 3; Sebastian Decl. ¶ 3.)

Accordingly, the Court finds a genuine dispute as to whether Plaintiffs Markov, Sebastian, and Kirkland worked without overtime compensation during the weeks listed in Court's Exhibit 1. Moreover, because Defendant Apex's own records have led the Court to this information, there is also a genuine dispute regarding whether Defendant Apex knew that Plaintiffs were working during these timeframes. As for those of Plaintiffs' claims not corresponding to weeks listed in Exhibit 1, they are subject to the remaining FLSA analysis.

## 2.  Defendants' Records Do Not Indicate More Than Forty Hours

"It is the employer's duty to keep records of the employee's wages, hours, and other conditions and practices of employment," and it is the employer "who is in a superior position to know and produce the most probative facts concerning

---

[6]  Court's Exhibit 1 is attached to this Order.

[7]  In its reply brief, Defendant Apex asserts that the four ten-minute breaks Plaintiffs received during the course of their shift should be deducted from the Court's hours-worked calculation. (Defs.' Rep., Doc. 29, at 12.) However, the Court has found no evidence of this assertion. Therefore, such breaks will not be considered.

the nature and amount of work performed." Allen, 495 F.3d at 1314 (citing Anderson, 328 U.S. at 687). Thus, "in situations where the employer has failed to keep records or the records cannot be trusted, the employee satisfies [his] burden of proving that [he] performed work without compensation if [he] produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Jackson v. Corr. Corp. of Am., 606 F. App'x 945, 952 (11th Cir. 2015)(per curiam)(citing Allen, 495 F.3d at 1316)(internal quotation marks omitted); see also Anderson, 328 U.S. at 687 ("The solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the [FLSA]."). Accordingly, "[t]he employee's burden is not great and the Eleventh Circuit has found an employee can successfully shift the burden of proof by presenting his own testimony indicating the employer's time records cannot be trusted and that he worked the claimed overtime." Centeno v. I & C Earthmovers Corp., 970 F. Supp. 2d 1280, 1287 (S.D. Fla. 2013)(internal quotation marks and citation omitted).

28

Whether an employer's records are trustworthy depends on the facts of each case. See Allen, 495 F.3d at 1316. In Allen, the Eleventh Circuit found that a genuine dispute existed as to the trustworthiness of the employer's records based on the following evidence: (1) testimony that some employees would not record overtime because the employer would not pay them for it; (2) testimony that some employees were forced to amend their time sheets to show no more than forty fours worked; (3) testimony that employees' time sheets "were torn up if they reflected overtime work"; and (4) testimony that an individual in charge of time sheets would white out overtime hours. Id. The court in Jackson v. Corr. Corp. of Am., No. CV 311-111, 2014 WL 575720, at *10 (S.D. Ga. Feb. 11, 2014), aff'd 606 F. App'x 945 (11th Cir. 2015), held that no genuine dispute as to the trustworthiness of an employer's records exists when, inter alia, there was "no evidence that Defendant altered, manipulated, or destroyed Plaintiff's time records." Here, Plaintiffs have not submitted any evidence – documentary or testimonial – challenging or even referencing the records Defendants have submitted. Consequently, the Court cannot conclude that a genuine dispute as to the trustworthiness of these documents exists. See Gilson v. Indaglo, Inc., 581 F. App'x 832, 833 (11th Cir. 2014)(relying on employees' failure "to produce documentary evidence or state with specificity

particular dates on which their actual work hours were not accurately reflected in the employer's records" in affirming the district court's grant of the employer's motion for judgment as a matter of law).

Even assuming Plaintiffs presented enough evidence to produce a genuine dispute as to the records' trustworthiness, they have not submitted enough evidence to create a genuine dispute as to the amount and extent of their work as a matter of just and reasonable inference. In making this determination, the Court is guided by the Eleventh Circuit's opinion in Jackson, 606 F. App'x 945. In Jackson, the court found that the plaintiff "ha[d] never stated with any clarity or precision the number of hours she allegedly worked, the amount or nature of that work, where or when the work was completed, or anything else that would assist a factfinder in approximating Jackson's unpaid overtime." Id. at 952. Consequently, the Jackson court found that the plaintiff's assertions were "vague" and "were not evidence from which can be drawn just and reasonable inferences about the nature or extent of that work." Id.

In the instant matter, offering no evidence that they are entitled to unpaid overtime compensation, Plaintiffs Kirkland and Zukic cannot create a genuine dispute as to the amount and extent of their work as a matter of just and reasonable inference. As for Plaintiff Sebastian, his only evidence

relevant to this issue is the following statement from his declaration: "I often worked over forty hours per week." (Sebastian Decl. ¶ 4.)   Appearing to be nothing more than an allegation tracking the language of the FLSA, this statement is vague and lacks any clarity or precision regarding the number of hours he actually worked.   Therefore, Plaintiff Sebastian also fails to make the requisite showing.

Finally, in support of his overtime claim, Plaintiff Markov offers this assertion from his declaration: "I worked at least fifty (50) hours each week" — "usually . . . fifty-five (55) hours." (Markov Decl. ¶¶ 4, 6.)   While Plaintiff Markov's declaration provides more clarity and precision on this issue than Plaintiff Sebastian's, Plaintiff Markov still has not provided information regarding: (1) when he worked shifts that were undocumented by Defendant Apex; (2) if Defendant Apex's conduct drove him to underreport his shifts; (3) whether "triggering factors," e.g., certain events, would help him recall when he worked overtime; and (4) whether third parties would be able to support his claim of unpaid overtime.   In the absence of well-established written evidence, this is the type of information that courts have turned to when deciphering whether a genuine dispute is present.   See, e.g., Allen, 495 F.3d at 1317 (highlighting the significance of a plaintiff's ability to use triggering factors and the knowledge of third

parties to indicate if and when she worked overtime); Jackson, 2014 WL 575720, at *11 (relying on the fact that "there [wa]s no evidence that employer's conduct in the instant case drove [p]laintiff to misreport or underreport her time" in concluding that there was no genuine dispute as to whether plaintiff had shown the amount and extent of her overtime work as a matter of just and reasonable inference); Thrower v. Peach Cnty., Ga., Bd. of Educ., No. 5:08-cv-176, 2010 WL 4536997, at *6 (M.D. Ga. Nov. 2, 2010)(emphasizing plaintiffs' testimony identifying certain duties for which they were not provided overtime compensation). Consequently, Plaintiff Markov is left only with his assertion that he worked at least fifty - but usually fifty-five - hours per week.  As prior courts have demonstrated, this evidence, without more, is insufficient to create a genuine issue as to the amount and extent of an employee's work as a matter of just and reasonable inference. See Jackson, 2014 WL 575720, at *4, *11.  As a result, Plaintiff Markov cannot make the requisite showing in order for the overtime claims not referenced in Court's Exhibit 1 to move forward.

### III. CONCLUSION

For the reasons above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment (Doc. 10).  Of Plaintiffs' minimum wage claims not precluded by the statute of

limitations, only (1) Plaintiffs Markov, Sebastian, and Zukic's claims against Defendant Apex and (2) those of Plaintiff Kirkland's claims against Defendant Apex arising from his capacity as a casino dealer before June 25, 2014, may proceed. Of Plaintiffs' overtime claims, only Plaintiffs Markov, Sebastian, and Kirkland's claims against Defendant Apex for the dates referenced in Exhibit 1 may proceed. Accordingly, the Clerk is directed to **ENTER JUDGMENT** in favor of Defendant GICL and further directed to **TERMINATE** Defendant GICL as a party.

 **ORDER ENTERED** at Augusta, Georgia, this _21ST_ day of March, 2016.

                                    _____
                                    HONORABLE J. RANDAL HALL
                                    UNITED STATES DISTRICT JUDGE
                                    SOUTHERN DISTRICT OF GEORGIA

EXHIBIT 1

| Plaintiff | Weeks of More Than 40 Hours |
|---|---|
| **Stoyan Markov** | December 31, 2012–January 6, 2013<br>March 18-24, 2013<br>April 1-7, 2013<br>April 8-14, 2013<br>April 15-21, 2013<br>May 6-12, 2013<br>May 13-19, 2013<br>May 20-26, 2013<br>May 27 – June 2, 2013<br>June 3-9, 2013<br>June 10-16, 2013<br>June 17-23, 2013<br>June 24-30, 2013<br>July 1-7, 2013<br>July 8-14, 2013<br>July 15-21, 2013<br>July 22-28, 2013<br>July 29 – August 4, 2013<br>August 12-18, 2013<br>August 19-25, 2013<br>August 26 – September 1, 2013<br>September 2-8, 2013<br>December 16-22, 2013<br>December 30 – January 5, 2014<br>January 13-19, 2014<br>February 3-9, 2014<br>February 17-23, 2014<br>February 24 – March 2, 2014<br>March 3-9, 2014<br>March 10-16, 2014<br>March 24-30, 2014<br>March 31 – April 6, 2014<br>April 7-13, 2014<br>April 21-27, 2014<br>April 28 – May 4, 2014<br>May 5-11, 2014<br>May 12-18, 2014<br>May 19-25, 2014<br>June 2-8, 2014<br>June 9-15, 2014<br>June 16-22, 2014 |

| Gerry Sebastian | May 20-26, 2013<br>July 1—7, 2013 |
| --- | --- |
| Zorica Zukic | None |
| Billy Kirkland | December 31, 2012-January 6, 2013<br>May 20-26, 2013<br>March 24-30, 2014<br>May 19-25, 2014<br>August 4-10, 2014 |